Filed 2/14/23  P. v. Usilton CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM BECK USILTON III,<br><br>Defendant and Appellant. | F083471<br><br>(Stanislaus Super. Ct. No. CR-19-001145)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Appellant and defendant William Beck Usilton III spent an evening drinking at a bar with Cody Sorensen, who regularly visited defendant at his apartment and stayed overnight. A few hours later, defendant and Sorensen argued in the apartment, and defendant shot Sorensen in the face and killed him.

Defendant was tried for second degree murder. At trial, the prosecution's witnesses to the homicide, who were defendant's roommates, testified that Sorensen was supposed to stay overnight at the apartment, defendant and Sorensen argued, Sorensen was not armed and did not threaten defendant, and defendant produced a gun and fired the fatal shot.

Defendant and his girlfriend, however, testified that Sorensen pushed his way into the apartment, defendant told him he was not wanted there, Sorensen shoved the girlfriend to the floor and refused to leave, and defendant shot him in self-defense or defense of another.

The jury was instructed on perfect self-defense and justifiable homicide, and voluntary manslaughter based on imperfect self-defense, or sudden quarrel or heat of passion. The jury found defendant not guilty of the charged offense of second degree murder, but guilty of the lesser included offense of voluntary manslaughter (Pen. Code, § 192, subd. (a)),[1] and that he personally used a firearm (§ 12022.5, subd. (a)). He was sentenced to 21 years in prison.

On appeal, defendant argues the court erroneously granted the prosecution's motion to introduce a photograph of Sorensen while he was alive because the photograph evoked sympathy for the victim and was prejudicial. Defendant also claims the prosecutor committed prejudicial misconduct in closing argument that requires reversal,

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

even though the court immediately ordered the argument stricken and advised the jury that the argument was not based on facts in evidence

Defendant further argues the court failed to properly instruct the jury that lawful self-defense and justifiable homicide were defenses to both the charged offense of murder *and* the lesser included offense of voluntary manslaughter, and the instructional errors prevented the jury from finding him not guilty of any criminal offense.

Defendant raises several sentencing issues. Defendant contends, and the People agree, his sentence must be vacated because the court imposed the upper term for voluntary manslaughter and the firearm enhancement based on aggravating circumstances not found true by a jury beyond a reasonable doubt, and the matter must be remanded based on the enactment of Senate Bill No. 567 (2021–2022 Reg. Sess.). Defendant raises other sentencing contentions that we will briefly address but, as will be explained, he may raise these issues at the resentencing hearing on remand.

We, thus, affirm his conviction for voluntary manslaughter and the true finding on the firearm enhancement but vacate the sentence and remand the matter for further appropriate proceedings.

## FACTS

As of February 2019, defendant had been living for a few months in a one-bedroom apartment in Oakdale with Samantha Wolfe, his half-sister; and Matthew Meade, with whom Wolfe was involved in a relationship at the time.[2] The apartment was in the name of Wolfe's father, who paid the rent. Wolfe and Meade contributed to the rent, and they testified that defendant did not pay anything.

The apartment had a solid front door with an outer metal security gate. There was a sliding glass door in the living room, that led outside to a common area in the complex that allowed access to and from other apartments.

___
[2] By the time of trial, Wolfe and Meade were no longer in a relationship.

Wolfe and Meade slept in the only bedroom. Defendant slept on a bed in the corner of the living room. There was conflicting evidence whether Alyssa Hartwig, Wolfe's friend, regularly lived there or sometimes stayed overnight. Whenever she was at the apartment, she slept on the floor in the bedroom.

Defendant was dating Callie Bruederle. She did not live at the apartment, but occasionally stayed overnight and slept in the living room with defendant. Bruederle kept some personal items in a small plastic cabinet located near defendant's bed.

**Sorensen's Relationship with Defendant and His Roommates**

Meade and Wolfe were friends with Cody Sorensen. Wolfe had previously dated Sorensen, and they stayed friends. Meade described Sorensen as his best friend.

Wolfe testified that defendant and Sorensen were close friends and "buds." Meade, however, testified that Sorensen and defendant were not close friends, but they had been hanging out together and were becoming friends.

Sorensen lived in Angels Camp and often came to Oakdale on the weekends and stayed with defendant, Wolfe, and Meade at their apartment. He would sleep on a blue chair in the living room. Sorensen did not have a key to the apartment. Meade testified that Sorensen was very respectful when he stayed with them and never caused any trouble.

Sorensen was five feet seven inches tall, weighed 137 pounds, and was 25 years old. Defendant was about six feet one inch tall and weighed 265 to 280 pounds.

**The Guns Owned by Defendant and Sorensen**

Wolfe testified that defendant owned a Beretta handgun and kept it in a bag in the living room. Defendant also owned a shotgun that was stored in the bedroom closet. Wolfe had never seen defendant carry the gun as a concealed weapon.

Meade testified that defendant kept his shotgun next to his bed in the living room and kept his handgun in different places around the apartment.

4.

Wolfe testified that during Sorensen's overnight visits to the apartment, she had seen him with his own handgun that he kept in a backpack. When he went out, he asked Wolfe to keep the backpack in her bedroom, or he sometimes tucked the gun into his back waistband. He never pulled out his gun in an aggressive manner when he was staying with them. Wolfe testified that there were times she went to the bars with defendant and Sorensen, and they were both carrying their handguns with them.

Meade also saw Sorensen's gun during his previous visits and knew he kept it in his backpack. Meade, however, testified that Sorensen did not carry the gun with him when he left the apartment, he always kept the gun in the backpack, and he would hide the backpack in the apartment when he went out.

**Defendant and Sorensen Leave for the Bars**

Wolfe testified that on Saturday, February 9, 2019, Sorensen arrived at the apartment with his personal belongings and planned to stay overnight. Wolfe, Hartwig, and Bruederle were there, and the group was going to spend the evening at the nearby bars in downtown Oakdale. Wolfe became ill, however, and decided not to go, and Hartwig stayed with her.

Around 8:00 p.m., Sorensen, defendant, and Bruederle left the apartment together. As will be discussed below, defendant and Bruederle testified that they got into defendant's truck with Sorensen, and defendant drove them to the bars that night.

Meade was still working the nightshift at the Tesla plant in Manteca when his friends left for the bars. At 11:00 p.m., Meade got off work and sent text messages to Sorensen to pick him up. Sorensen replied he could not get him because he was already drinking. Wolfe and her father picked up Meade from work and drove him back to the apartment.

Meade remained in the apartment for the rest of the night with Wolfe and Hartwig, and they slept in the bedroom.

5.

**Defendant and Sorensen at the Bars**

The H-B Saloon (the Saloon) and the Battered Beaver Bar (Battered Beaver) are located a few blocks from each other, near the intersection of East F Street and North Yosemite in downtown Oakdale. The two bars were about four or five blocks away and walking distance from defendant's apartment. There are extra police patrols in the area on busy weekend nights. The bars are required to close by 2:00 a.m.

On the night of February 9, 2019, Oakdale Police Officer Andrew Stever was driving on a routine patrol around the bars. He saw Sorensen, defendant, and Bruederle walking together in rear parking area of the Saloon. As Stever drove by the three people, he called out and asked how it was going. One person in the group said everything was fine. Stever testified that everyone seemed happy, no one appeared intoxicated, and he continued on his patrol.

The prosecution introduced testimony from several witnesses as to what happened when defendant and Sorensen were at the bars that night.

### Derek Brown

Derek Brown, Sorensen's friend, testified that he arrived at the Saloon with Frankie Taylor. Sorensen, defendant, and Bruederle were already there.[3]

Sorensen had introduced defendant to Brown on a previous occasion, but Brown did not know defendant well. Brown frequently saw defendant and Sorensen together, however, and believed they were good friends. Brown thought defendant was acting as the Saloon's bouncer that night.

Brown greeted Sorensen, and they talked about bull riding because Sorensen was teaching him how to do it. Everyone was having a great time, and there were no issues between defendant and Sorensen. Defendant was drinking but did not appear intoxicated.

---

[3] Brown testified that he thought Meade and Wolfe were at the Saloon that night. None of the other witnesses testified to that, and the Saloon's security videotape did not show they were there.

Brown and Taylor eventually left the Saloon and walked to the Battered Beaver. When they arrived, Sorensen was already there and standing outside the bar's front door. Brown did not see defendant and Bruederle.

Brown testified that Sorensen was upset, crying, pacing around, and pretty mad. Brown tried to calm him down and found out Sorensen had seen his former girlfriend. Sorensen told Brown that he got upset, punched a wall, and injured his hand.

Brown testified that they had a "heart-to-heart" talk. Sorensen was emotional and in tears about his former girlfriend. Sorensen questioned their own friendship and asked Brown if they were really friends. Brown assured Sorensen they were friends. Brown hugged Sorensen and said goodbye.

Brown was concerned about Sorensen's emotional condition that night, but testified that Sorensen did not appear intoxicated, he was not slurring his words or stumbling, and he was walking normally. Brown admitted that he gave a prior statement to the police and said Sorensen was "drunk or tipsy," but he was not stumbling or "wasted." Brown never saw Sorensen fight with defendant or anyone else that night.

Brown was afraid Sorensen might do something to hurt himself or someone else because of his emotional state. Brown thought defendant was Sorensen's friend and decided to talk to defendant.

Brown testified that he saw defendant at the Saloon, talked to him, and told him that Sorensen was upset and stressing out. Brown asked defendant to look after Sorensen and make sure he was okay and got home since Brown was leaving.

Brown testified that after this conversation, defendant seemed frustrated, "[n]ot by me" but with Sorensen. Brown left the Saloon between 11:00 p.m. and midnight, and he never saw Sorensen again.

### Jerry Lopez

Around 10:00 p.m., Jerry Lopez, a childhood friend of Sorensen, arrived at the Saloon. About one hour later, Lopez saw Sorensen with Brown, Taylor, defendant, and

7.

Bruederle.  Everyone was drinking, but defendant and Sorensen did not appear to be drunk, and they were not stumbling or slurring their words.

Lopez stayed at the Saloon all evening.  Lopez testified that Sorensen, defendant, and Bruederle left and went to the Battered Beaver and then returned to the Saloon.  Lopez never saw any problems between defendant and Sorensen.

Lopez testified that Sorensen returned to the Saloon with defendant and Bruederle.  Lopez was told that Sorensen wanted to speak to him outside.  Lopez met Sorensen outside.  Sorensen was holding his hand and was upset.  Sorensen said that he saw his former girlfriend at the other bar and thought he had dislocated his knuckle.  Lopez testified Sorensen's demeanor was okay and he was not trying to fight anyone.

### Bo Bacigalupi

Bo Bacigalupi's family owned and operated the Saloon.  Bacigalupi met defendant through "the bar scene," and defendant helped the Saloon's bouncer on a previous occasion.

Bacigalupi was working as the Saloon's bartender that night.  The videotape from the Saloon's interior surveillance camera showed Sorensen, defendant, and Bruederle standing at the bar.  Bacigalupi testified that defendant and Sorensen were drinking that night, but they did not yell, argue, or fight with each other or anyone else.

Bacigalupi testified that around 1:30 a.m., a man sitting at the bar made inappropriate and rude statements.  Jerry Lopez confronted the man, and they had "a little scuffle."  The video from the Saloon's surveillance camera showed Lopez and the man fighting.  Defendant and Sorensen were not involved in the fight.

Bacigalupi tried to break up the fight, and defendant helped him escort the man out of the Saloon.[4]

---

[4] Officer Stever testified that sometime between 1:30 a.m. and 1:50 a.m., he was dispatched to the Saloon because of a fight.  When he arrived, the bar's employees advised him that the matter was resolved, and he did not become involved.

8.

**Closing Time at the Saloon**

After the fight was over, Bacigalupi announced to the Saloon's patrons that it was closing time. Everyone left and Bacigalupi locked the front doors. Lopez stayed behind and helped Bacigalupi clean and mop up.

Lopez testified that just before the Saloon closed, defendant left with Bruederle, Brown, and Taylor, and they walked down the street.

About 10 or 15 minutes after Bacigalupi locked the front doors, he heard someone knocking at the side door. Bacigalupi unlocked the door, and Sorensen was there and asked what happened to his friends. Bacigalupi told him that he had seen defendant and his girlfriend walking down the street, pointed in that direction, told Sorensen that his friends were over there, and he needed to go home.

Bacigalupi and Lopez testified that they did not have any problems with Sorensen, he was not yelling, he did not get physical or aggressive, and he did not try to push through the door.

Officer Stever drove by the Saloon around closing time at 2:00 a.m. Stever saw Sorenson standing by the Saloon's side entrance and thought he was trying to get inside. Bacigalupi was leaning out of the door and talking to Sorensen, and they were not fighting. Bacigalupi flagged down Stever to stop.

Officer Stever stopped his patrol car by the Saloon's side door, and determined Sorensen was trying to get inside to find his friends. Bacigalupi asked Stever to tell Sorensen that "his friends went that way." Stever did so and told Sorensen to go home. Sorensen said okay and walked away. Sorensen did not appear angry, upset, or intoxicated.

Officer Stever testified that Sorensen got into a vehicle that was parked near the Battered Beaver.

# THE HOMICIDE

Around 2:20 a.m. on February 10, 2019, Hartwig, Wolfe, and Meade were asleep in the apartment's bedroom.  Hartwig heard something and woke up Wolfe.  Wolfe heard two men yelling and woke up Meade.

Hartwig hid in the bedroom closet.  Wolfe and Meade left the bedroom and stood in the hallway.  They saw defendant and Sorensen arguing in the living room.

**Meade Describes the Homicide**

Meade testified that Sorensen, defendant, and Bruederle were standing by the sliding glass door in the living room.  They were arguing about something, but Meade could not determine what they were talking about.  Defendant was wearing shorts and socks.

Meade testified that defendant shoved Sorensen down to the floor and told Sorensen " 'to get the f[**]k out.' "  Meade did not see anything in defendant's hands when he pushed down Sorensen.

Sorensen got up and raised his clenched fists like he was going to fight defendant.  Sorensen never touched defendant, however, and walked towards the front door.

Meade testified that Sorensen opened the solid front door like he was going to leave, but he did not open the outer metal security screen door.  Sorensen did not go outside; he walked back into the living room.  Meade thought Sorensen was going back to get his stuff, which was in a duffle bag by the blue chair where he slept.

Meade testified that when Sorensen walked back into the living room, defendant was holding a gun and aimed it at Sorensen.  Meade heard the sound of the trigger being cocked.  Sorensen told defendant, " 'If you're going to shoot me, shoot me.' "  Meade never saw Sorensen with a gun or anything in his hands.  Sorensen did not threaten defendant or say anything else.

Defendant shot Sorensen in the face.  Meade testified that Sorensen dropped to the floor and fell over a rabbit cage and the blue chair in front of him.

10.

**Wolfe Describes the Homicide**

Wolfe testified that when she looked into the living room, Sorensen was standing by the front door. Defendant was standing next to his bed in the living room, and in front of the sliding glass door. Bruederle was on defendant's right side. The sliding glass door was open.

Defendant told Sorensen to "get the f[**]k out, you're not welcome here," and "[g]et your belongings and get out." Sorensen yelled back to defendant, "Can I get my phone, keys, and wallet?"

Wolfe testified that defendant walked closer to Sorensen. Sorensen also walked forward, and defendant "shoved" Sorensen to the floor. Sorensen got up and raised his fists as if to fight. He was drunk and wobbly.

At that point, Wolfe did not see a gun in defendant's hand and Sorensen did not fight with defendant. Wolfe thought Sorensen went to the front door and stayed outside for 25 to 30 seconds. He returned into the living room, and Wolfe thought he was getting his stuff. Sorensen said something, but Wolfe could not hear what he said.

Wolfe testified that defendant was holding a gun and aimed it at Sorensen's head. Sorensen turned toward defendant and told him, " 'If you're going to shoot me, shoot me.' " Sorensen did not have anything in his hands, his fists were no longer in the air, and he did not make any gestures toward defendant. Wolfe did not hear Sorensen threaten defendant in any way. Sorensen's backpack and belongings were on the floor between defendant and Sorensen.

Wolfe testified that defendant was standing in front of the sliding glass door, and he shot Sorensen. Sorensen's legs went down, and his body was "just dangling" over the blue chair and the rabbit cage. Wolfe ran into her bedroom.

**The 911 Call**

After defendant shot Sorensen, he told someone to call 911. Meade ran to the bedroom and called 911.

11.

Meade told the dispatcher they needed an ambulance because his "fiancée's brother" shot "our friend" in the head. In response to the dispatcher's questions, Meade said the shooter and victim were inside, and he did not know the location of the gun.

After he made the 911 call, Meade returned to the living room, and defendant and Bruederle were still there. Meade was afraid of defendant because he had just shot Sorensen. Meade testified that defendant said, " 'Better say it was self-defense.' "

### THE INVESTIGATION

At approximately 2:30 a.m. on February 10, 2019, officers from the Oakdale Police Department responded to the apartment on the dispatch that someone had been shot in the head. The officers took positions outside the apartment and ordered the occupants to walk out with their hands up. Meade testified that he followed the officers' orders and walked out with Wolfe, Hartwig, and Bruederle, but defendant stayed in the living room.

Bruederle, Wolfe, Hartwig, and Meade were wearing nightclothes and no shoes when they walked out. It was cold and raining. The officers testified that they were crying, emotional, and "huddled together," and Meade looked "extremely terrified."

Meade, Wolfe, Hartwig, and Bruederle were placed in handcuffs and escorted away from the front door. The officers had limited information about what happened and quickly asked them about the locations of the shooter and the victim.[5]

According to the videotapes from the officers' body cameras, Bruederle said that the shooter's name was "William," he was inside the apartment, and she did not know

---

[5] The prosecution introduced videotapes and accompanying transcripts from the body cameras of three officers who were at the scene: Officer Stever; Officer DiGiorno; and Officer Magaña. These videotapes showed Wolfe, Bruederle, Meade, and Hartwig walking out of the apartment and being questioned by the officers about what happened; defendant walking out of the apartment and being taken into custody; defendant's spontaneous statements at the scene; and the officers' initial entry into the apartment and discovery of Sorensen's body.

12.

where the gun was. Officer Stever asked her why William was not coming out of the apartment. Bruederle asked to go back and get him, and she was told no. Stever asked who was shot in the head. Bruederle replied: "Guy that came in [*sic*] backdoor, he shoved me out of the way." Stever again asked who was shot, and Bruederle said, "I don't know his name," but he was inside. Stever asked who shot him. Bruederle said, "The other guy that's inside. My fiancée." Stever again asked if they knew the guy who was shot, and Bruederle said: "I believe his name is Cody."

Meade testified that he spoke to Officer Magaña at the scene, and reported that Sorensen told defendant, " '[i]f you're going to shoot me, shoot me,' " that defendant shot the victim, and defendant "kept saying it was self-defense, it was self defense." At trial, Meade testified that he disagreed with defendant's statements that it was self-defense.

**Arrest of Defendant**

The officers remained outside the apartment, and Officer Stever shouted to "William" to come out. Defendant complied with their orders and walked out with his hands in the air. He was shirtless and wearing shorts and socks. He was not armed.

As defendant walked out, an officer asked if anyone else was in the house. Defendant said, "[T]he man I shot, he came in. I told him to leave," and "[h]e would not – was, uh, uninvited guest." Officer Stever asked if the gun was still inside, and defendant said yes. Stever asked if the other guy was alive or dead. Defendant believed he was dead. Stever asked how he was dressed. Defendant said he was wearing a paisley shirt, a black leather jacket, and a straw cowboy hat that was on the floor.

Officers DiGiorno and Magaña were instructed to patdown defendant and take him into custody. Magaña asked defendant exactly where the victim was in the apartment. Defendant said he was "between the recliner and the bunny cage." Defendant additionally said: "I told him to leave – he wouldn't leave. He came at me. He charged at me. I said, 'I have a loaded weapon,' " and that "[h]e would not leave."

13.

Officer DiGiorno's body camera recorded that defendant asked Wolfe, "You mad at me?"  Wolfe said, "I heard arguing."  Defendant replied, "Yes you can.  He came in the house unannounced.  She let him in to get his stuff.  He f[**]king charged at me.  I'm f[**]king sorry."

Defendant asked Officer DiGiorno to adjust the handcuffs because he was "a big guy."  Defendant continued talking:  "I mean, I don't know if you want police brutality on you or – I've been nothing but cooperative.  Nobody else has anything to do with this officer.  My girlfriend let him in and he barged in.  I told him to leave and he wouldn't leave."  DeGiorno replied:  "Okay."  Defendant continued:  "And warned him of an armed weapon I had and he would not leave.  Nobody else is accountable for this but me, officer."  Defendant added:  "This ain't my fault.  It's Cody's fault.  I love you.  It's Cody's fault.  I don't know why the f[**]k he barged back in the house.  Told him to get his shit and go."

Officer Stever testified that during his brief interaction with defendant outside the apartment, there was nothing unusual about his behavior, he seemed calm, his speech was not slurred, and he did not appear intoxicated.

**Discovery of Sorensen's Body**

Officer Stever and other officers entered the apartment's open front door and found Sorensen's body in the living room.  He was dead and had been shot once in the head.  The apartment's interior was messy with blankets and clothing strewn around.  There was a black bag several feet away from Sorensen's body and several items on the floor that would have blocked Sorensen's path to the bag.

Sorensen's body was in a kneeling position, his arm was above his head, and he was slumped over several items, including a chair, a rabbit cage, and boxes.  Sorensen's head was hanging down, and there was a large pool of blood that had dripped down from the fatal head wound onto the rabbit cage, boxes, and floor.  It appeared he had been

14.

standing in this area when he was shot and collapsed over the boxes. Sorensen did not have anything in his hands.

**Defendant's Additional Statements**

According to the videotapes from their body cameras, Officers Stever and Magaña initially could not find the gun. Stever contacted the officers outside by radio and requested them to ask "one of the parties" where the gun was.

In response to the radio message, Officer DiGiorno asked defendant where the gun was. Defendant said it should be on the mattress, and it was a Beretta nine-millimeter. Defendant added: "I don't think there's any law against protecting your household," and "I did nothing wrong. When you're in an apartment that you don't belong …."

As the officers were about to adjust his handcuffs, defendant said, "I served – a year in Afghanistan. I know how it works. You ain't cool, you're dead."

**Search of the Apartment**

At 5:30 a.m. on February 10, 2019, Detective Stilwell and two other officers started to search the apartment pursuant to a warrant.

Sorensen's body was near the sliding glass door, and that door was wide open. At some point, the officers closed the glass door to secure the interior of the apartment.

When the coroner removed Sorensen's body, the officers saw an entry wound under his left eye. There was an exit wound through the back of his head.

Sorensen was wearing a black leather jacket, a shirt, jeans, and shoes. Sorensen's personal belongings included a holster that could be used to carry a concealed weapon and one bullet. He also had two crystal rocks that weighed 0.06 grams and appeared to be crystal methamphetamine, but the substances were never tested.

A black Beretta nine-millimeter semiautomatic pistol was on top of defendant's bed in the living room. The firearm was loaded with a magazine that contained six or seven full metal jacket nine-millimeter rounds. There was a round in the chamber, the

hammer was pulled back, and the trigger was engaged. The Beretta was registered to defendant.

A red and black bag was near defendant's bed in the living room and contained both nine-millimeter and .22-caliber ammunition.

A red cell phone and a wallet were on the living room floor, between Sorensen's body and the sliding glass door.

A spent nine-millimeter shell casing was on the living room floor, next to the cell phone and near the sliding glass door. It appeared to have been ejected from the Beretta when the gun was fired.

There was a bullet hole through the apartment's outer metal security screen door, but not through the solid front door.

A spent and deformed nine-millimeter projectile was found outside the apartment's front entrance in an exterior hallway, about 12 feet away from the doorway. The bullet hole through the front metal security door lined up with the location of the projectile in the outside hallway.

**Search of Sorensen's Truck**

Sometime between 3:00 to 5:00 p.m. on February 10, 2019, Sorensen's truck was searched pursuant to a warrant. It was parked on the street in front of the apartment complex.

There were two nine-millimeter magazines in the truck's cab that were loaded with hollow-point rounds. A small bag in the back seat contained nine-millimeter ammunition. A box in the truck bed contained Remington 17 HMR small-bore rounds, used to hunt small game.[6]

---

[6] Detective Stilwell testified that the amount and types of ammunition found in Sorensen's truck were common in that rural area. It was also common for residents to carry concealed firearms.

**Discovery of Sorensen's Gun**

Meade, Wolfe, Bruederle, and Hartwig were taken to the police department and separately interviewed. They were released later on February 10, 2019.

Meade testified that he returned to the apartment sometime between 9:00 a.m. and 11:00 a.m. Bruederle and Wolfe were there. Wolfe's sister arrived later that day. Wolfe went into the bedroom and slept. Meade tried to clean the blood off the floor.

Meade testified that Bruederle was packing up her personal belongings and defendant's things. At some point, Bruederle announced that she found Sorensen's gun. Meade testified the gun was in the bottom drawer of a small plastic "nightstand" that was next to defendant's bed in the living room. Bruederle's personal things were in the same drawer with the gun.

Officer Magaña testified that after Bruederle was released from the police department, she returned later, on February 10, and asked if she left her cell phone there. The officers found the cell phone and returned it to Bruederle. Bruederle then informed the officers that they found Sorensen's pistol in the apartment, and they did not feel comfortable keeping it there.

Officer Magaña went to the apartment and met Bruederle, Meade, and Hartwig. Bruederle led Magaña into the living room, pointed to the small plastic cabinet next to the bed, and said the gun was in the bottom drawer. Magaña recovered a CZ pistol in the drawer that was covered by clothing.[7] Magaña asked the group if anyone had touched or manipulated the gun, and they said no.

At the time of the homicide, the plastic cabinet would have been to defendant's left and about 15 feet away from Sorensen's position.[8]

---

[7] Detective Stilwell testified that he was not sure if an officer searched the plastic cabinet and drawers during the initial search of the apartment.

[8] In closing argument, defense counsel asserted Sorensen's gun "was deliberately missed" when the officers searched the apartment, "in other words, it wasn't reported." Counsel suggested Sorensen's gun "was removed from his body, quickly hidden in an

17.

Officer Magaña testified that he unloaded a magazine from the pistol and secured the weapon. The ammunition found in the cab of Sorensen's truck appeared to fit the CZ pistol.

Officer Magaña also found an unspent nine-millimeter round under the recliner in the living room.

Bruederle asked Officer Magaña to check Sorensen's truck to see if there was a pistol in the vehicle. Magaña searched the truck and did not find a weapon.

**The Autopsy**

The pathologist testified that Sorensen was shot once in the face. The entrance wound was between Sorensen's nose and just below his left eye. The exit wound was through the back of his head.

The bullet traveled in a horizontal line and slightly upward, from front to back. There was no gunshot residue on Sorensen's body, which meant the gunman did not fire the shot at close range and would have been more than 18 inches away from him.

Sorensen had bruises on the knuckle and fingers of his right hand, but no broken bones. The toxicology tests showed he was intoxicated with alcohol and methamphetamine.

---

underclothing drawer, a random drawer in the same room to give the impression that [he] was not armed at the time of his death," and whoever did it "wanted to make it incriminating" toward defendant. Counsel continued that "physical evidence in an ongoing investigation was manipulated to discredit the claims made by [defendant] at the scene that he was defending himself," perhaps "because of personal animosity for [defendant] that someone had. Maybe it's because that someone knew Mr. Sorensen or the family…."

In rebuttal, the prosecutor suggested defendant and Bruederle knew Sorensen's gun was in that drawer before the homicide "because [Bruederle] says that the next day she was looking for her phone in the drawer. If she hadn't gone into that drawer that night, why would her phone be in there," and defendant knew Sorensen was not armed.

**The Nature of the Fatal Gunshot Wound**

Detective Stilwell testified that Sorensen was shot in the "T-Box" of his face, an area that consists of the soft tissue across the eyes and down to the mouth that forms a "T." If a person is shot in the "T-Box," the bullet travels through the face and into the brain stem, and immediately incapacitates the victim.

Detective Stilwell testified that since Sorensen was shot in his face's "T-Box," he was immediately incapacitated. Based on the body's position, Sorensen fell where he was standing, and he was not charging at defendant or moving in any way when he was shot. When Sorensen fell, "his arms were almost in a scarecrow fashion, held up [by the boxes] while his body was folded underneath him." There were also boxes and other items that would have blocked his forward progress from that area.

Based on the physical evidence and the locations of the expended shell casing and the deformed spent round, Detective Stilwell believed the shooter was facing the victim, and standing at "an angle linear to … the front door, and so I would have gauged it at no more than seven feet from the shooter to the person shot." The gunman was not standing closer to the victim because "if you shoot somebody within an arm's length, there is going to be powder burns on their face," and there were no powder burns on Sorensen's face.

Officer Stever similarly testified to his opinion that the gunman was standing where the shell casing was found near the sliding glass door, and Sorensen was facing the gunman when he was shot.

**Meade's Contacts with Sorensen's Mother After the Homicide**

Meade testified that he stayed in contact with Tracy Fernandes, Sorensen's mother, after the homicide. Around March or April 2019, Fernandes loaned $3,000 to Meade, so Meade and Wolfe could buy a vehicle because Wolfe's car had mechanical problems. Fernandes testified that the money belonged to Sorensen, and she told Meade to try to pay her back whenever he got a job. Meade called Fernandes a couple of times

19.

to talk about the loan. Wolfe was also on the line during these calls. The loan had not been repaid by the time of trial.

Meade testified that when he called Fernandes for help, he only asked if he could use Sorensen's truck, but Meade gave him some money instead. Meade testified that he never asked for or obtained any more money from Fernandes.

Fernandes, however, testified that Meade asked to borrow money again and said he was hired as an electrician and needed to pay for gasoline. She gave Meade a couple hundred dollars and did not ask him to repay it.

Fernandes testified about a third time when Meade asked to borrow a couple hundred dollars from her. Fernandes said no because she did not have the money. Fernandes never discussed Meade's trial testimony during these conversations about money or the car loan.

### DEFENSE EVIDENCE

**Defendant's Trial Testimony**

Defendant testified that he met Sorensen through Wolfe in 2018. After they first met, Sorensen did not visit the apartment very often. Defendant and Sorensen eventually became "pretty good friends," and Sorensen occasionally visited defendant on weekends.

Defendant knew Sorensen owned a handgun, and he had it with him every time he visited the apartment. Sorensen would conceal the gun in a leather belt holster on his hip or back. He sometimes kept it in a small gray backpack.

On the day of the homicide, Sorensen arrived at the apartment at defendant's invitation, but defendant was not home. Sorensen waited for him in the parking lot, and when he got home, he let Sorensen inside. Sorensen was the "[s]ame as he always was, happy go lucky. I never had an issue with him." Sorensen brought three bottles of wine with him, and Wolfe and Hartwig joined him in having a glass.

20.

Defendant testified that Sorensen did not appear to be intoxicated or under the influence of drugs before they left the apartment. Defendant did not know he had used methamphetamine.

Defendant testified that he drove Sorensen and Bruederle to the Saloon. Sorensen was carrying his gray backpack, where he kept his firearm when it was not on his person. Defendant was not concerned because he knew Sorensen liked to keep his gun with him, and he did not leave it where someone could mess with it.

While they were at the Saloon, defendant had five or six beers and two shots. Defendant testified that Sorensen drank more than usual and had beers and double shots of whiskey. They stayed at the Saloon for a while, and then they went back into defendant's vehicle and drove to the Battered Beaver; defendant parked near the bar. They briefly stayed at the Battered Beaver, and then walked back to the Saloon around 10:00 p.m.

Defendant testified that at some point that night, Sorensen left the Saloon, but defendant did not go with him. Around midnight, Sorensen returned to the Saloon with Derek Brown and Frank Taylor. Sorensen was cradling his right hand, it was "busted," and it looked like he hit something.

Defendant testified that Brown asked him to "look out" for Sorensen. Defendant thought he meant that Sorensen "had too much to drink and he needed somebody to watch out for him, make sure that he didn't get himself into any trouble." Defendant testified that he nodded at Brown and said okay.

Defendant testified that Sorensen kept walking in and out of the Saloon, which seemed unusual for him. At one point, defendant helped Bacigalupi remove a "problem customer" who was fighting with Jerry Lopez. Defendant later told Sorensen that the same guy had returned, and Sorensen said, "Let's go find him." After closing time, Sorensen engaged this guy in an aggressive manner. They were getting into each other's

21.

faces, and it looked like they were going to fight. Defendant stepped between them, told the other guy to get out of there, and told Sorensen it was time to leave.

Defendant walked away from the Saloon with Sorensen and Bruederle. As they were walking, defendant told Sorensen that he did not care for the way that he allowed his former girlfriend to manipulate his emotions, and she was not worth his time. Sorensen got upset and shoved defendant twice. Defendant was surprised by his conduct because they were good friends.

Defendant told Sorensen that "I was done with him for the night," and not to return to the apartment. Defendant told Bruederle they were leaving. Sorensen walked away and "threw his hand over his shoulder, as in a whatever gesture." Defendant believed Sorensen heard him because he made the gesture.

### *The Homicide*

Defendant testified that he walked back to the apartment with Bruederle; Sorensen was not with him. They locked the front door and the sliding glass door, changed their clothes, and got ready for bed. They heard noises outside, and defendant grabbed his gun because he thought someone was trying to break in. He did not realize Sorensen was at the sliding glass door.

Defendant testified that Bruederle opened the sliding glass door "not very much, just enough to stick her arm out," and he thought she was handing Sorensen his things. Bruederle told him that he could not be there, "and then I heard her say, 'No.' And I saw the screen door get flung open, and saw her get shoved … out of his way."

Defendant testified that Bruederle did not invite Sorensen into the apartment. After Sorensen shoved Bruederle out of the way, she fell to the floor and Sorensen charged at defendant. Defendant testified that he realized Sorensen was in the apartment, and he retreated as far back as he could. "I had a loaded firearm in my hands, and as he continued to get closer to me, I told him repeatedly … to get the f[**]k out. Um, and he had continued to advance on me with a loaded firearm and my hands pointed at him."

22.

Defendant testified that Sorensen saw that he was holding a gun, and Sorensen "also heard me cock it as well, because I put a magazine in, chambered a round, took it off safe and cocked the hammer." Defendant "was scared out of my mind. I had no idea what he was doing." Sorensen continued to come at defendant even though he saw the gun. Sorensen raised his clenched fists, and defendant shoved him away with his other hand.

Defendant testified that Sorensen "stumbled" and went towards the front door. Defendant thought the conflict was over, and Sorensen realized he was not wanted there.

Sorensen opened the solid front door, then turned around and headed back towards defendant. Defendant testified:

> "[Sorensen] positioned himself behind the blue chair. I could not see his torso. I continued to tell him to get out. He told me, 'If you're going to shoot me, shoot me.' And it looked like he was drawing a weapon as he raised his hands extremely fast, and as a reaction, I lifted my firearm and fired a shot."

Defendant testified that he was standing by his own bed, and Sorensen "lifted his arm in a fast motion like he was drawing his firearm." Defendant did not take aim when he fired the shot. After he fired, he turned around and saw Meade in the hallway, and told him to call 911.

Defendant denied that he said, " 'You better say it's self-defense' " after he shot Sorensen, as claimed by Meade. Defendant testified that he later told the police that Sorensen was an "uninvited guest" because "he had forced his way in, and at that point when someone forces their way in and you didn't invite them in, they are an uninvited guest or intruder." Defendant feared for the lives of Bruederle and himself, because Sorensen shoved her and forced his way in.

**Callie Bruederle**

Callie Bruederle testified as a defense witness. At the time of the homicide, she had been in a relationship with defendant for two years. Bruederle testified that they

23.

were no longer involved at the time of trial, but admitted she regularly talked with defendant on the telephone, sometimes after court hearings, she still cared about him, and she did not want him to get into trouble.

Bruederle did not live at defendant's apartment but often stayed overnight with him. Bruederle had only known Sorensen for a few months prior to the homicide. Sorensen was in possession of a pistol every time Bruederle saw him. Sorensen would carry the pistol in a concealed holster on his hip, under his leather jacket.

Bruederle went to the apartment to see defendant on the afternoon of February 9, 2019. Sorensen also arrived that day. Later in the evening, Bruederle went to the bars with defendant and Sorensen, and they got into in defendant's truck. Defendant was driving, Sorensen was in the front passenger seat, and Bruederle was in the back. Bruederle testified that Sorensen was carrying a small, grey, tactical bag. They first went to the Saloon, where defendant had two shots and three beers, and Sorensen had several shots and a few beers.

At some point, Sorensen left the Saloon, but Bruederle and defendant did not go with him.

Around midnight, Sorensen returned to the Saloon with Taylor and Brown. Bruederle testified that Sorensen had hurt his right hand, and "[w]e had previously been approached and told that he had been punching a brick wall."

Bruederle was standing outside the Saloon's front doors with defendant and Sorensen when Sorensen became aggressive toward defendant. Sorensen threw his phone, money, hat, belt, and "[p]retty much anything that was on him he could" at defendant. Bruederle picked up Sorensen's phone and money for safekeeping. Bruederle conceded that in her prior statement to the police, she failed to mention that Sorensen was throwing his possessions around or that she had picked them up.

Bruederle testified that after the Saloon closed for the night, they were still outside, and Sorensen was screaming at an unknown man who had been removed from

24.

the bar because of an altercation. Sorensen tried to fight with this man, and "they were both kind of going at it."

Bruederle testified that "[a] little bit after" these incidents, Bruederle and defendant were stopped by police behind the Saloon. Defendant and Bruederle "basically broke ties" with Sorensen at that point, and they left the Saloon and walked back to the apartment.

### Sorensen Enters the Apartment

Bruederle and defendant returned to the apartment through the front door and locked it. She believed the sliding glass door was also locked. They changed their clothes and got ready for bed.

Bruederle testified that someone tried to open the locked front door, and then they heard noises by the sliding glass door. They did now know who it was, and defendant "immediately started grabbing for his gun."

Bruederle testified that she went to the sliding glass door and "recognized that it was [Sorensen] by his hat first. And when we had gotten home, I realized I had his phone and his money, so I attempted to unlock the slider and open it enough for me to give him his things so that he could find his way home or something."

Bruederle opened the sliding glass door wide enough for her arm to fit through and intended to give Sorensen his phone and money. Bruederle told Sorensen that he needed to leave and was not welcome. Defendant was standing behind Bruederle.

When Bruederle tried to give Sorensen his property, Sorensen "flung" the sliding glass door "all the way open," physically made contact with Bruederle, and used force to push her out of the way. Sorensen "pushed his way past me, entered the apartment and moved directly towards [defendant]." Bruederle was terrified.

### Defendant Shoots Sorensen

Bruederle testified that Sorensen was screaming at defendant and yelled, "How could you? How could you do this to me?" Defendant yelled back at him.

Sorensen walked away from defendant and went towards the front door, but he did not go outside. Sorensen turned around and walked back towards defendant. She did not see Sorensen and defendant have any physical contact.

Bruederle turned around and noticed Meade was watching, and then she heard the gunshot. She was looking at Meade when defendant shot Sorensen, but claimed Sorensen was in motion before the gunshot.

Bruederle testified that defendant was standing near the sliding glass door when he shot Sorensen. Sorensen was standing near the front door, and there were things piled on the floor between Sorensen and defendant. She did not see a firearm or anything in Sorensen's hands. After defendant fired the gun, he immediately said to call 911.

Bruederle testified that when she walked out of the apartment and met the police, they were pointing rifles and asked who was shot. Bruederle admitted that she initially said she did not know who was shot. She was "in shock and fear, terror" because of what happened and "it was just too much to process," but she disclosed Sorensen's identity within minutes.

Bruederle was taken to the police station and questioned, and then returned to the apartment. She looked for her cell phone in the apartment and, instead, found Sorensen's gun in a drawer where she kept her belongings. She had never seen the gun in that drawer before, and she did not touch it.

Bruederle drove defendant's truck to the police department, retrieved her cell phone, and told the police that they needed to get Sorensen's gun from the apartment. An officer later came to the apartment and picked up the gun.

**Additional Defense Evidence**

The defense recalled Officer Stever, who testified that when he interviewed Meade about the homicide, Meade said the gun was at defendant's side when he shot Sorensen, and defendant kept saying, "You better leave or I will shoot[.]" According to Meade, defendant said, "I was defending myself." After recounting this statement, Meade told

26.

Stever, "That's not how I saw it." Meade did not say that defendant told him, "You had better say" it was self-defense.

A sample of defendant's blood, taken at 10:24 a.m. on February 10, 2019, contained 0.049 percent alcohol.

The toxicology tests of Sorensen's cardiac blood showed it contained 0.18 percent blood-alcohol concentration; alprazolam (Xanax) at 0.01 milligrams per liter; d-methamphetamine at 1.98 milligrams per liter; and d-amphetamine 0.107 milligrams per liter.

A forensic toxicologist testified for the defense, that someone who was the same size as Sorensen would have consumed about six standard-sized alcoholic drinks to have a 0.18 percent blood-alcohol level. Such a person would have been very intoxicated, which would have affected his judgment and emotional volatility. Methamphetamine and amphetamine are stimulants and would make a person more agitated, abusers of these drugs are more likely to have various psychoses and psychological issues than the public at large, and methamphetamine abuse has been correlated with increased likelihood of violent behavior.

The forensic toxicologist further testified that Alprazolam was commonly used to treat anxiety and not recommended for use with alcohol. The level of Alprazolam in Sorensen's blood was relatively low, and that meant he could have consumed it several days earlier.

The forensic toxicologist testified to his opinion that based on the combination of drugs and alcohol in Sorensen's blood, he was intoxicated, and it was "very likely" his drug and alcohol use affected his decision-making ability. The defense toxicologist conceded that he did not know about the nature or frequency of Sorensen's methamphetamine use, or whether he was addicted to the drug.

## PROCEDURAL BACKGROUND

On June 9, 2020, an information was filed in the Superior Court of Stanislaus County charging defendant with count 1, murder (§ 187, subd. (a)), with an enhancement for personally and intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

### Trial and Verdict

On June 29, 2021, defendant's trial began with motions and jury selection.

On July 16, 2021, the jury found defendant not guilty of second degree murder, but guilty of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)) and found true the lesser allegation that defendant personally used a firearm (§ 12022.5, subd. (a)).

### Sentencing

On October 18, 2021, the court imposed an aggregate term of 21 years, based on the upper term of 11 years for voluntary manslaughter, plus a consecutive upper term of 10 years for the firearm enhancement.

The court imposed a restitution fine of $6,000 (§ 1202.4, subd. (b)), suspended the parole revocation fine in the same amount (§ 1202.45); and reserved victim restitution. The court also imposed a criminal conviction assessment of $30 (Gov. Code, § 70373), and a court operations assessment of $40 (§ 1465.8).

On October 20, 2021, defendant filed a timely notice of appeal.

## DISCUSSION

### I.   Admission of Sorensen's Photograph

Defendant argues the court abused its discretion and violated his due process rights by introducing before the jury a photograph of Sorensen while he was alive. Defendant asserts the photograph was not relevant to any issue in the case, it was unduly prejudicial because there was no purpose to introduce it "other than to evoke victim sympathy," and the admission of the photograph requires reversal of his conviction.

## A.     *The People's Motion*

Prior to trial, the prosecutor moved to introduce one photograph of Sorensen while he was alive "for identification purposes with the witnesses." The prosecutor's motion asserted some witnesses might not be able to identify Sorensen from the autopsy photographs, viewing the autopsy photographs might cause undue hardship or mental or emotional distress on the witnesses, and Sorensen's photograph "may help to reduce any jury confusion regarding the names and identities of the parties involved in the case. The motion further asserted it was important for the jury "to see the victim as he was in life, his size and dimensions," to negate defendant's claim of self-defense.

## B.     *Hearing on the Motion*

At a pretrial hearing on the motion, the court stated that it would allow one photograph of Sorensen while alive for witnesses to identify him so "they don't have to show a picture of someone who's deceased to, like, the mother or to someone. So I generally allow one picture."

Defense counsel objected to the photograph as "irrelevant and not necessary" because the witnesses "knew Mr. Sorensen very well."

The court replied that the decedent still had to be identified and a photograph was appropriate. Defense counsel suggested that if a photograph was used, it should not be something "that tends to draw favor from the prospective jurors."

The prosecutor displayed the proposed photograph of Sorensen. Defense counsel again objected and thought it "looked like a model, a professional photograph," and said that something similar to a driver's license picture should be used instead.[9]

The court stated the prosecutor's proposed photograph showed Sorensen "wearing a cowboy hat and looks like he's at a rodeo somewhere," and he was "leaning against a post. In the background, though, there's at least one other person whose full face and

___

[9] Despite defense counsel's statement, there was no evidence to explain the source of the photograph.

29.

body you can see." The court directed the prosecutor to crop the photograph so that it just showed Sorensen's face.

The court stated that it would admit the cropped photograph to allow Sorensen's mother and other witnesses to identify him because "you don't want to show a mother another picture of a dead body of their child, that's just not right. So I'm going to allow that, but I'll allow one for identification."

## C. *Introduction of Sorensen's Photograph*

At trial, Tracy Fernandes, Sorensen's mother, was the prosecution's first witness. The prosecutor presented her with Exhibit No. 1, the photograph of Sorensen that was previously shown to the court and asked if she knew who he was. Fernandes testified that it was a photograph of Sorensen taken at the rodeo in Duncan Mills, and that was how he looked prior to his death.

The prosecutor moved to introduce Exhibit No. 1 into evidence. Defense counsel asked to examine it and objected. The court and the parties discussed the photograph outside the jury's presence.

The photograph identified as Exhibit No. 1 was the same photograph shown to the court during the pretrial hearing, and which the court previously directed to be cropped. The prosecutor stated she was not going to publish this particular photograph to the jury, and she had produced a cropped version of the same photograph, but it was still on her computer. The court stated the witness had to identify the photograph that was going to be admitted if it was different than Exhibit No. 1. Defense counsel clarified he was not objecting to that particular exhibit, but to the introduction of any photograph of the victim.

The prosecutor produced the cropped version of Sorensen's photograph, it was marked as Exhibit No. 1A, and the court admitted it.

Thereafter, the trial resumed in front of the jury. The prosecutor showed the cropped version on the courtroom's video screen, identified as Exhibit No. 1A, and

Fernandes testified that it was the same as the first photograph of Sorensen, it was cropped, and that it showed her son.

**D.** *Additional Testimony About Sorensen's Photograph*

During the trial, the prosecutor presented Exhibit No. 1A, the cropped version of Sorensen's photograph, to the following witnesses and asked them to identify him: Samantha Wolfe, Detective Stilwell, Derek Brown; Jerry Lopez; and Matthew Meade.

Wolfe and Meade identified Sorensen as their friend, testified about his relationship with defendant, and that they saw defendant shoot him in the apartment. Lopez and Brown also identified Sorensen as their friend and the man they saw at the bar that night. Detective Stilwell identified Sorensen as the man whose body was found in the living room.

**E.** *Admission of Photographs*

Defendant relies on *People v. Poggi* (1988) 45 Cal.3d 306 (*Poggi*) and argues the court erroneously admitted the photograph of Sorensen while still alive.

In *Poggi*, the prosecution moved to introduced two photographs in a murder trial. The first picture depicted the decedent while still alive, standing with her husband and son before a Christmas tree; and the second was an autopsy photograph. The defendant objected and offered to stipulate to the decedent's identity. The prosecutor declined the offer, and argued the photographs were relevant for identification purposes. The court overruled the objections and admitted the photographs. (*Poggi, supra*, 45 Cal.3d at pp. 322–323.)

*Poggi* held the admission of both photographs was erroneous. "It is true, as the People argue, that the admissibility of photographs lies primarily in the discretion of the trial court. [Citation.] But it is also true that the court has no discretion to admit irrelevant evidence. [Citations.] The photographs here are not relevant to any disputed material issue. The only matters on which they have probative value are the following: [the decedent] was a human being; she was alive before the attack; and she is now dead.

31.

In view of defense counsel's offer to stipulate, these issues were removed from the case as matters in dispute. When, as here, ' "a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence … to prove that element to the jury." ' " (*Poggi, supra*, 45 Cal.3d at p. 323.)

*Poggi* further held the error was not prejudicial because the evidence against the defendant was strong, the autopsy photograph was not unduly gruesome, and the Christmas tree photograph did not "seem likely to have appreciably intensified whatever feelings – whether of hostility toward [the] defendant or sympathy toward [the decedent] – that the jury may have developed in this case. Thus, we cannot conclude that it is reasonably probable a result more favorable to [the] defendant would have been reached in the absence of the error." (*Poggi, supra*, 45 Cal.3d at p. 323.)

Since *Poggi* was decided, the California Supreme Court has clarified that "[a]lthough only relevant evidence is admissible [citation], '[t]he state is not required to prove its case shorn of photographic evidence merely because the defendant agrees with a witness or stipulates to a fact.' [Citation.] Trial courts have wide discretion in admitting such photographic evidence, and we have explained that 'trial courts should be alert to how photographs may play on a jury's emotions, especially in a capital case, [and] we rely on our trial courts to exercise their discretion wisely, both to allow the state fairly to present its case as well as to ensure that an accused is provided with a fair trial by an impartial jury.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)

The Supreme Court has further clarified that "[p]hotographic evidence of murder victims while they were alive is not necessarily inadmissible." (*People v. Boyette, supra*, 29 Cal.4th at p. 424.) The court has "repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items. [Citations.] Otherwise, there is a risk that the photograph will merely generate sympathy for the victims." (*People v. DeSantis* (1992) 2 Cal.4th 1198,

1230 (*DeSantis*).) However, "the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. [Citation.] The decision to admit victim photographs falls within the trial court's discretion, and an appellate court will not disturb its ruling unless the prejudicial effect of the photographs clearly outweighs their probative value." (*People v. Harris* (2005) 37 Cal.4th 310, 331–332.)

In *DeSantis*, the defendant argued the court erroneously admitted the photograph of an elderly couple; the defendant was charged with murdering the husband and attempting to murder the wife. *DeSantis* acknowledged the photograph "possibly did generate sympathy for the victims, a harmless- and congenial-appearing elderly couple," but declined to find error. (*DeSantis, supra,* 2 Cal.4th at p. 1230.) "The photograph, which was shown to three witnesses, was relevant to establish the witnesses' ability to identify the victims as the people about whom they were testifying. The possibility that it generated sympathy for the victims is not enough, by itself, to compel its exclusion if it was otherwise relevant." (*Id.* at p. 1230.)

In *People v. Martinez* (2003) 31 Cal.4th 673, the defendant similarly argued the trial court erroneously granted the prosecution's motion to admit two photographs of the decedent in a murder case, that showed him still alive and with relatives, and argued the photographs were irrelevant and prejudicial. *Martinez* held the court did not commit error because "the prosecutor used the photographs for identification purposes while examining five different witnesses, and also to identify [the decedent] as the subject in the autopsy photographs. Our cases have permitted similar uses of photographs of victims while alive." (*Id.* at p. 692.)

Defendant acknowledges the post-*Poggi* cases but relies on *People v. Winn* (2020) 44 Cal.App.5th 859 (*Winn*), which cited to *Poggi* and held the trial court erroneously admitted a photograph of the decedent in a murder case. The photograph consisted of a portrait-style headshot showing the decedent smiling while wearing a dress shirt, tie, and glasses. Defense counsel stipulated the decedent was alive prior to the stabbing, and

33.

argued the photograph was inadmissible. The prosecutor declined the stipulation, and argued the photograph was relevant for witnesses to identify the decedent, and to show he wore glasses since a crushed pair was found next to his body. The court overruled the objections and held the prosecution was entitled to prove the decedent's identity using his photograph. (*Id.* at p. 865.)

*Winn* cited the Supreme Court's cautionary admonishment against admitting photographs of murder victims while alive, unless the prosecution can establish the relevance of the pictures to avoid generating sympathy for the victims. "To comply with this stricture, the trial judge should carefully consider the actual relevance of photos of murder victims while alive, and, if such evidence is indeed admissible, state the grounds on the record, *thereafter exercising vigilance to restrain counsel from the use of the photos for a purpose beyond that for which they were admitted*." (*Winn, supra*, 44 Cal.App.5th at pp. 866–867, italics added.) *Winn* noted the trial court only admitted the photograph for the limited purpose of the witnesses establishing the decedent was the person with whom they had spoken and held there was minimal probative value on that issue since there was no dispute about the decedent's identity. (*Ibid.*)

*Winn* further, however, held that the prosecutor "went beyond the purposes for which the trial court admitted [the photograph]," and "used the photograph at the start of his opening statement, *telling the jury to 'meet [the decedent] on one of his better days,' while referencing the photo*. Given that defense counsel had explicitly argued that the photograph could be used in an inflammatory fashion, the trial court should have limited the use of the evidence to comply with the court's grounds for admitting it." (*Winn, supra*, 44 Cal.App.5th at p. 867, italics added.) While finding error, *Winn* held the error was not prejudicial because the evidence against the defendant was overwhelming, his self-defense claims were not credible, and he made statements that showed "an obvious motive" to attack and kill the decedent. (*Id.* at p. 867.)

**F.** *Analysis*

In this case, the court did not commit error or abuse its discretion when it admitted Exhibit No. 1A, the cropped photograph of Sorensen while still alive, for the limited purpose of identification. Sorensen had been shot in the face, with an entry wound between his nose and below his left eye, and an exit wound in the back of his head. The prosecutor's use of Exhibit No. 1A was extremely brief and limited to having Sorensen's mother and other witnesses briefly view the photograph and confirm that he was the person they knew, saw at the bars that night, and/or saw get shot in the face by the defendant. Sorensen's mother testified that the photograph accurately depicted how he looked, and she also testified to his height and weight, facts that were relevant to defendant's self-defense claims.

The photograph was also relevant and probative to assist the jury in reviewing the surveillance videotape from the Saloon, where the witnesses testified Sorensen was there with defendant and Bruederle, and he was not involved in any fights or the altercation between Jerry Lopez and the unknown man inside the bar. In addition, when Bruederle initially spoke to the officer outside the apartment, she claimed not to have known the name of the person who had been shot, even though she had been with him all evening, and eventually said the person's name was "Cody."

In contrast to *Winn*, the prosecutor did not deviate from the court's ruling that the photograph was admissible only for the limited purpose of identification. The prosecutor did not cite to Sorensen's photograph and make inflammatory remarks about the homicide or appeal to the jury's sympathies. Instead, the prosecutor complied with the court's ruling about the limited admissibility of the photograph, and there was no error.

## II. The Prosecutor's Closing Argument

Defendant contends his conviction must be reversed because the prosecutor committed prejudicial misconduct in closing argument "by disparaging [him] with the false accusation that [he] regularly uses his gun to get people to do what he wants" and

"inappropriately slandered [defendant] with a false accusation that has no relation to any evidence presented at trial."

## A. *Prosecutorial Misconduct*

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights … but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished …, is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal. [Citations.] 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct *is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice*.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328, italics added.) "A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

## B. *Closing Argument*

The prosecutor began her closing argument with the following statements: " 'If you ain't cool, you're dead.' These are the words that came out of the defendant's mouth

just minutes after the shooting of Cody Sorensen.[10]  [¶]  These are the words that came out of the defendant's mouth that shows his intent that night.  It shows his mental state.  It shows that in his mind if you don't go along with the program, you're dead.  And … that's what Cody was doing.  Cody wasn't getting out of the house fast enough for the defendant.  Cody wasn't getting his shit and going fast enough for the defendant.  So he's done waiting.  He shot him."

The prosecutor argued defendant was guilty of murder, and the testimony from defendant and Bruederle about his alleged self-defense claim was not credible as to both perfect and imperfect self-defense.

Defendant's claim of prosecutorial misconduct is based on the following italicized sentence.

> "[THE PROSECUTOR]:          So why should you convict here?  Because [defendant] said in the beginning, if you ain't cool, you're dead.  Cody wasn't going along with the program.  *The defendant is used to using his gun to be able to get people to leave – to do what he wants.*

> "[DEFENSE COUNSEL]: Objection.  Misstates the evidence.

> "THE COURT:      Sustained.  There was no evidence about any prior gun use by the defendant.[11]

---

[10] The prosecutor's reference to defendant's statement, "[I]f you ain't cool, you're dead," was to one of the spontaneous statements he made at the scene shortly after he was taken into custody.  According to the videotape from Officer DiGiorno's body camera, defendant stated: "I served – a year in Afghanistan.  I know how it works.  You ain't cool, you're dead."

[11] Prior to trial, the prosecution moved to introduce evidence about defendant's prior violent acts – that he allegedly threatened Meade with a pistol on two different occasions; defendant aimed a pistol at and threatened another man who Wolfe dated; and defendant's employers stated he was fired from his job because he punched another employee.

At the hearing on the motion, the prosecutor argued the evidence should be admitted if defendant opened the door by claiming the victim had a character for violence, or if he testified that his own character was one of peacefulness.  Defense counsel objected to any character evidence.

"[THE PROSECUTOR]:    In this situation –

"THE COURT:        It's stricken.

"[THE PROSECUTOR]:    In this situation, the defendant is using his gun antagonistically.   He's trying to get Cody to do what he wants, and he wants Cody to leave fast.  And Cody wants to get his stuff because Cody's stuff is there.  If Cody isn't moving fast enough and he's not going along with the program and if you ain't cool, you're *dead*, in the defendant's point of view."  (Italics added.)

Defense counsel did not make any additional objections to this section or request further admonitions or instructions.

## C.    *Analysis*

During closing argument, an attorney is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom.  (*People v. Bemore* (2000) 22 Cal.4th 809, 846; *People v. Sandoval* (1992) 4 Cal.4th 155, 183; *People v. Morales* (2001) 25 Cal.4th 34, 44.)  However, "statements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." (*People v. Armstrong* (2019) 6 Cal.5th 735, 797; *People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)  In determining prejudice from such statements, we view them in the context of the argument as a whole. (*People v. Rodriguez,* at p. 480.)

Defendant asserts the prosecutor committed misconduct by referring to matters not in evidence, when she argued:  "The defendant is used to using his gun to be able to get people to leave – to do what he wants."  As noted by the People, however, defense counsel immediately objected to this statement, the court sustained the objection and stated there were no facts to support this argument, and the court ordered the argument stricken.

---

The court did not rule on the motion, but stated it was not inclined to admit evidence of defendant's prior acts "unless specifically there's some evidence presented by the Defense as to the victim's propensity for violence here."  Such an issue was not raised, and the evidence of defendant's prior acts was not introduced.

Defendant acknowledges the court ordered the prosecutor's argument stricken but asserts the trial court found the statement constituted misconduct, the prosecutor's misconduct was prejudicial, and, to the extent counsel should have requested a further admonition, he has not forfeited review because any admonition "would not have cured the harm caused by the prosecutor's misconduct."

We disagree with defendant's assertion that the court's immediate reaction to defense counsel's objection – an admonition to the jury that there was no evidence to support the statement, and the order striking the statement – was insufficient to address the matter. "Defendant fails to demonstrate that the trial court's swift action was inadequate." (*People v. Tully* (2012) 54 Cal.4th 952, 1046.) We presume the jury fully heeded the court's order, and there is nothing in the record to infer the jurors did not follow the court's ruling. (*People v. Dickey* (2005) 35 Cal.4th 884, 914; *People v. Wash* (1993) 6 Cal.4th 215, 263.)

Moreover, the prosecutor's statement did not render the trial so fundamentally unfair so that the error was not harmless beyond a reasonable doubt, and it is not reasonably probable that a more favorable result would have been reached absent the alleged objectionable argument given its extreme brevity. In determining prejudice from prosecutorial misconduct, "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Morales, supra*, 25 Cal.4th at p. 44.) After the court ordered the argument stricken, the prosecutor did not continue with her objectionable statement, and quickly pivoted her argument to assert defendant used his gun "to get Cody to do what he wants, and he wants Cody to leave fast," repeating her

initial assertions from the beginning of her closing argument. Thus, reversal is neither warranted nor appropriate.**12**

## III. The Instructions on Perfect Self-defense and Justifiable Homicide

Defendant was charged and tried for second degree murder. As set forth above, defendant relied on a defense of perfect self-defense, that he actually and reasonably believed Sorensen was a threat to both Bruederle and himself. As will be explained, the jury was instructed on voluntary manslaughter as a lesser included offense, based on both sudden quarrel or heat of passion, and imperfect self-defense. The jury found defendant not guilty of second degree murder, and guilty of the lesser included offense of voluntary manslaughter.

Defendant contends the court committed prejudicial error when it gave CALCRIM Nos. 505 and 506, the instructions on perfect self-defense and justifiable homicide, because they stated that perfect self-defense was a defense to murder, and the court failed to include required language that perfect self-defense was also a defense to the lesser included offense of voluntary manslaughter.

Defendant argues the omission of such language in these instructions was prejudicial because "the homicide instructions as a whole do not make clear to the jury that self-defense is a complete defense to voluntary manslaughter."

### A. *Homicide and Self-defense*

We begin with the well-settled legal principles at issue in this case. "Homicide, the killing of one human being by another, is not always criminal. In certain circumstances, a killing may be excusable or justifiable. [Citation.] Murder and manslaughter are the forms of criminal homicide." (*People v. Elmore* (2014) 59 Cal.4th 121, 132, fn. omitted (*Elmore*).)

---

**12** Having addressed defendant's claims of prosecutorial misconduct on the merits, we need not address his alternate argument of ineffective assistance.

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime." (*Elmore, supra,* 59 Cal.4th at pp. 133–134.) "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. [Citation.] A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide." (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172.)

" 'Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of … voluntary manslaughter. [Citation.]' [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice … in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" [citation], or when the defendant kills in "unreasonable self-defense" – the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 153–154, fn. omitted.)

" 'One acting in imperfect self-defense … actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable. [Citations.] Imperfect self-defense mitigates, rather than justifies, homicide; it does so by negating the element of malice.' " (*People v. Randle*, *supra*, 35 Cal.4th at p. 994.) Thus, a killing committed when the defendant's belief in self-defense "is *unreasonable* is not justifiable. Nevertheless, 'one who holds an honest but

41.

unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' [Citation.] We have also described this mental state as an 'unreasonable but good faith belief' in the need for self-defense. [Citation.] However, it is most accurately characterized as an *actual* but unreasonable belief." (*Elmore, supra*, 59 Cal.4th at p. 134, fn. omitted.)

### B. *The Court's Instructional Duties*

"A trial court must instruct the jury sua sponte on general principles of law applicable to the case. [Citation.] This requirement includes instruction on lesser included offenses supported by the evidence. [Citation.] A trial court is required to instruct sua sponte on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case." (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49; *People v. Abilez* (2007) 41 Cal.4th 472, 517.) Moreover, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)

### C. *The Instructions Given*

As relevant to defendant's contentions, as will be fully discussed below, the court instructed the jury with CALCRIM No. 500, defining homicide and justifiable homicide; CALCRIM No. 505, justifiable homicide based on self-defense or defense of another; and CALCRIM No. 506, justifiable homicide based on defending against harm to a person within the home or on property.

The court next gave CALCRIM No. 520, defining the elements of second degree murder, and express and implied malice; CALCRIM No. 522, that provocation may reduce a murder to manslaughter; CALCRIM No. 570, defining voluntary manslaughter

based on heat of passion; and CALCRIM No. 571, defining voluntary manslaughter based on imperfect self-defense. There were no other lesser included offenses.

Finally, the court gave a series of instructions about ejecting trespassers and perfect self-defense: CALCRIM No. 3476, right to defend real or personal property; CALCRIM No. 3477, presumption that a resident was reasonably afraid of death or great bodily injury; CALCRIM No. 3475, right to eject trespasser from real property; CALCRIM No. 3474, right to use force in self-defense only continues as long as the danger exists or reasonably appears to exist; and CALCRIM No. 3473, the right to self-defense may not be contrived.

### D.    *Forfeiture*

Before we address defendant's appellate contentions, he acknowledges that defense counsel did not object to the instructions or raise the issues now asserted on appeal – that the court failed to instruct the jury that perfect self-defense was also a complete defense to the lesser offense of voluntary manslaughter.

"Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim – at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

As explained above, the court's sua sponte duties to instruct include instructions on lesser included offenses and any defenses, including self-defense, supported by the evidence. (*People v. Villanueva, supra,* 169 Cal.App.4th at p. 49; *People v. Abilez, supra,* 41 Cal.4th at p. 517.) "Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo, supra,* 16 Cal.4th at p. 1015.)

We thus turn to defendant's contentions.[13]

### E. *Defendant's Claims of Instructional Error*

Defendant contends the court committed instructional error and violated his due process rights by "failing to include manslaughter in the self-defense instructions" of CALCRIM Nos. 505 and 506.

" '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] ' "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Castillo*, *supra*, 16 Cal.4th at p. 1016.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.)

### 1. CALCRIM No. 505

Defendant's first claim of instructional error is based on the first sentence of CALCRIM No. 505. This instruction defined defendant's primary trial defense – justifiable homicide based on self-defense or defense of another. As the court read it to the jury, the instruction's first sentence stated: "[A] defendant is *not guilty of murder* if he was justified in killing someone in self-defense or defense another." (Italics added.)

Defendant is correct that the court failed to insert the words "or manslaughter" in that first sentence so that it should have said: "A defendant is not guilty of murder *or manslaughter* if he was justified in killing someone …." (Italics added.)

---

[13] Defendant raises ineffective assistance as an alternative argument because of counsel's failure to object to the instructions as given. Since we are addressing the merits of his instructional claims, we need not reach the alternative claim of ineffective assistance.

The rest of CALCRIM No. 505 correctly defined the elements to find that defendant acted in lawful self-defense or defense of another: He reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; he reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and the defendant used no more force than was reasonably necessary to defend against the danger.

CALCRIM No. 505 also addressed reasonable belief, imminent danger, and future harm, and that the defendant was only entitled to use that amount of force a reasonable person would belief necessary, if the defendant "used more force than was reasonable, the killing was not justified," and the defendant was entitled to stand his ground and defend himself if necessary.

According to the reporter's transcript, the court read the last paragraph of CALCRIM No. 505 as follows: "The People have the burden of proving beyond a reasonable doubt that the killing here was not justified. If the People have not met this burden, you must find the defendant *not guilty of murder or manslaughter*." (Italics added.)

Thus, while the court failed to read the words "or manslaughter" in the introductory sentence of CALCRIM No. 505, it read those words in the final sentence so that the jury was instructed that if it found he committed a justifiable homicide as defined in that instruction, it had to find him not guilty of *murder or manslaughter*.

Defendant acknowledges the court included the words "or manslaughter" when it read the final sentence of CALCRIM No. 505 to the jury, but asserts the instruction was still erroneous because the final sentence in the *written* version omitted the words "or manslaughter." The final sentence in the written version of CALCRIM No. 505 stated: "If the People have not met this burden, you must find the defendant *not guilty of murder*." (Italics added.)

45.

" '[T]o the extent a discrepancy exists between the written and oral versions of jury instructions, *the written instructions provided to the jury will control.*' " (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026, italics added.) In this case, it is undisputed the court orally read defendant's preferred version of the instruction's last sentence to the jury. (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 803.)

While the trial court expressly stated at the beginning of deliberations that it was sending the verdict forms, transcripts of the videotapes, and a computer to view the exhibits into the jury room, we have reviewed the relevant sections of both the reporter's transcripts and the minute orders in the clerk's transcripts, and there is no statement or indication that the court sent the written instructions to the jury.

Even if the written instructions were sent into the jury room, there is no indication the jury was aware of the slight difference between the written and oral versions of the final words of the final sentence in CALCRIM No. 505, or any possible conflict between the first and last sentences, because it did not ask any questions about this point or any other issue during deliberations. (*People v. Wilson, supra*, 44 Cal.4th at p. 803.)[14] "Although this court gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule. It is thus possible the jury followed the oral instruction." (*Id.* at p. 804.)

The jury was thus instructed, pursuant to the court's oral instructions in CALCRIM No. 505, that if it found defendant acted in perfect self-defense, as correctly defined in that instruction, it had to find he was not guilty of *any* crime including both murder and manslaughter.

### 2. CALCRIM No. 506

Defendant's next claim of instructional error is based on CALCRIM No. 506, that defined justifiable homicide based on defending against harm to a person within the

---

[14] During deliberations, the jury asked to hear the testimony from Meade, Wolfe, and defendant; it did not ask any other questions.

home or on property. Defendant asserts that as with CALCRIM No. 505, CALCRIM No. 506 was similarly erroneous because it only stated that if the jury found he committed a justifiable homicide under that instruction, he could not be convicted of murder, and it failed to state that the jury could not convict him of "murder *or manslaughter*." (Italics added.)

In contrast to CALCRIM No. 505, however, when the court read CALCRIM No. 506 to the jury, the first sentence correctly stated: "The defendant is not guilty *of murder or manslaughter* if he killed to defend himself or any other person in the defendant's home," that "[s]uch a killing is justified and therefore not unlawful," and stated the relevant elements – that defendant reasonably believed that he was defending a home against Sorensen who violently tried to enter the home intending to commit an act of violence against someone inside; he reasonably believed that the danger was imminent; he reasonably believed that the use of deadly weapon was necessary to defend against the danger; and the defendant used no more force than was reasonably necessary to defend against the danger."

CALCRIM No. 506 addressed reasonable belief, imminent danger, and future harm, that defendant was only entitled to use that amount of force a reasonable person would belief necessary, if the defendant "used more force than reasonable, then the killing was not justified," and also that defendant was not required to retreat.

Defendant's claim of error as to CALCRIM No. 506 is that the court failed to read the entirety of instruction's final paragraph, that was included in the written version of the instructions. Defendant further asserts that even the written version was erroneous because the final sentence stated: "The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant *not guilty of murder*." (Italics added.) Defendant thus asserts that the written version was erroneous because the last words should have stated he could not be found guilty "of murder *or manslaughter*." (Italics added.)

47.

As explained above, there is nothing in the record to indicate the court gave the written instructions to the jury during deliberations. But it is also undisputed that the court completely failed to read the final paragraph of CALCRIM No. 506 to the jury. The first sentence of CALCRIM No. 506, however, correctly stated that "[t]he defendant is not guilty *of murder or manslaughter* if he killed to defend himself or any other person in the defendant's home," (italics added) and that "[s]uch a killing is justified and therefore not unlawful." As far as omitting the final paragraph of CALCRIM No. 506, the jury had already been instructed in CALCRIM No. 505 that the People had the burden of proving beyond a reasonable doubt that the killing was not justified.

**F.      *Prejudicial Error***

Defendant argues his claims of instructional error violated his federal constitutional right to due process and require reversal. "With regard to criminal trials, 'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is " 'whether the ailing instruction … so infected the entire trial that the resulting conviction violates due process.' " [Citation.] " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " [Citation.] If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 192.)

We examine the entirety of the instructions, the parties' arguments, and the jury's deliberations to determine that even if error occurred, it would be harmless under either *Chapman v. California* (1967) 386 U.S. 18 or *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Huggins*, *supra*, 38 Cal.4th at pp. 193–194; *People v. Wilson*, *supra*, 44 Cal.4th at pp. 804–805; *People v. Cain* (1995) 10 Cal.4th 1, 36.)

### 1. The Manslaughter Instructions

Defendant argues the omissions in CALCRIM Nos. 505 and 506, that failed to clarify justifiable homicide was a complete defense to *both* murder *and manslaughter*, were exacerbated by a similar omission in CALCRIM No. 570, that defined voluntary manslaughter based on sudden quarrel or heat of passion.

CALCRIM No. 570 stated that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." The instruction defined these terms plus provocation, and concluded:

> "The People have the burden of proving beyond a reasonable doubt the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant *not guilty of murder*." (Italics added.)

Defendant claims the final sentence of CALCRIM No. 570 was prejudicially erroneous because it should have stated, "[N]ot guilty of murder or manslaughter," for the following reasons:

> "[T]he jury was given two separate instructions on two different theories of voluntary manslaughter – heat of passion and imperfect self-defense – and only one of those two instructions even suggests that self-defense is a complete defense to voluntary manslaughter…. Indeed, the instruction on one of the two theories of voluntary manslaughter – heat of passion – *does not in any way mention self-defense, and does not tell the jury anything to indicate that self-defense is a complete defense to voluntary manslaughter*…."

In making this argument, defendant notes that CALCRIM No. 571, that instructed the jury on voluntary manslaughter based on imperfect self-defense, stated in relevant part:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter, also, if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another.

*"If you conclude the defendant acted in complete self-defense or defense of another, his action is lawful and you must find him not guilty of any crime.* The different between complete self-defense … or defense of another, and imperfect self-defense or imperfect defense of another, depends on whether the defendant's belief in the need to use deadly force was reasonable." (Italics added.)

Defendant states that CALCRIM No. 571 addresses perfect self-defense as resulting in a justifiable homicide and asserts similar language should have been included in CALCRIM No. 570. Defendant asserts the discrepancies between these two manslaughter instructions were prejudicial because the jury would have concluded "that self-defense is not a complete defense to voluntary manslaughter, and that it is only a defense to voluntary manslaughter on the basis of imperfect self-defense. In other words, from the given instructions, the jury would have no way to know that self-defense is a complete defense to voluntary manslaughter on a heat of passion theory."

Defendant's arguments about the alleged omissions in CALCRIM No. 570 are meritless. As explained above, the actual and reasonable belief a killing is necessary for self-defense is a complete defense to murder. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Further, an intentional killing based on the honest belief in the need for self-defense that is not objectively reasonable – "imperfect" or "unreasonable" self-defense – operates to negate the element of malice and reduces the crime from murder to manslaughter. (*Ibid.*) As a separate matter, a killing committed in response to a sudden quarrel or heat of passion negates malice and reduces a charge to manslaughter. (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.) "An unlawful homicide is upon ' "a sudden quarrel or heat of passion" ' if the killer's reason was obscured by a ' "provocation" ' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation." (*Ibid.*)

The theories of perfect and imperfect self-defense are not relevant to an instruction defining voluntary manslaughter based on sudden quarrel or heat of passion. "The unlawful killing of a person on a sudden quarrel or heat of passion is voluntary

50.

manslaughter [citation], not murder of any degree." (*People v. Najera*, *supra*, 138 Cal.App.4th at p. 221.) As a result, the court was not required to modify CALCRIM No. 570, that defined voluntary manslaughter based on sudden quarrel or heat of passion, to address any theories of perfect or imperfect self-defense. The reason that CALCRIM No. 571 addressed perfect and imperfect self-defense was because those issues were expressly implicated by that instruction. The last sentence of CALCRIM No. 570, was correct – defendant would be not guilty of murder based on sudden quarrel or heat of passion but would be guilty of voluntary manslaughter; self-defense is not an issue on this theory of manslaughter.

## 2. CALCRIM No. 500

Defendant's complaints about the omissions in CALCRIM Nos. 505 and 506 are not prejudicial in light of CALCRIM No. 500, that stated in relevant part:

> "Murder and manslaughter are types of homicide. The defendant in this case is charged with murder. [¶] A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime. [¶] If there is no legally valid excuse or justification, the killing is unlawful, and depending on the circumstances, the person is guilty of either murder or manslaughter...." (Italics added.)

Defendant discounts the language in CALCRIM No. 500 because it is a "general" instruction because it does not "cure the hopelessly defective self-defense instructions." We disagree. As previously explained, the correctness of jury instructions is to be determined from the entire charge of the court, the absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole, and we presume the jury is capable of understanding and correlating the court's instructions. (*People v. Castillo, supra*, 16 Cal.4th at p. 1016; *People v. Scott* (2015) 61 Cal.4th 363, 399.)

We find that considering the entirety of the instructions, any omissions in CALCRIM Nos. 505 or 506 were fully addressed by CALCRIM No. 500 – that defendant

51.

was not guilty of any crime, including the lesser offense of manslaughter, if the jury found he had a legally valid justification.

### 3. Closing Argument and Deliberations

We further note that in reviewing claims of instructional errors or omissions, "any theoretical possibility of confusion [may be] diminished by the parties' closing arguments .…" (*People v. Garceau* (1993) 6 Cal.4th 140, 189; *People v. Mason* (2013) 218 Cal.App.4th 818, 825; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1014; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek*), abrogated on other ground by *People v. Rangel* (2016) 62 Cal.4th 1192.)

The prosecutor argued defendant was guilty of second degree murder, he acted with malice and intent to kill, the People had the burden to prove he was guilty of murder beyond a reasonable doubt, and defendant's entire story about self-defense was not credible. There was no justification "because an argument is not enough, especially an argument that the defendant started. Not leaving the apartment fast enough is not enough. And challenging the defendant's ego is not a reason to kill somebody." The prosecutor did not address voluntary manslaughter or imperfect self-defense.

We may also consider defense counsel's statements during closing argument when determining whether the instructional omissions were prejudicial. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 297; *People v. Cady* (2016) 7 Cal.App.5th 134, 149.)

In his closing argument, defense counsel cited CALCRIM No. 506, and that it stated: "The defendant is not guilty of murder or manslaughter if he killed to protect defendant himself or any other person in Defendant's home." Counsel read the rest of the instruction to the jury, and argued the facts supported the elements stated in CALCRIM No. 506, and defendant's testimony about what happened in the apartment was credible and supported both theories of justifiable homicide.

Defense counsel also focused on the differences between perfect and imperfect self-defense:

52.

"There is another kind of self-defense that you've received the instruction for, it's called an imperfect self-defense. A killing that would otherwise be murder is reduced to a voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. If you conclude that the defendant acted in complete self-defense or defense of another, his action was lawful, and you must find him not guilty of any crime. [¶] The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief and the need to use deadly force was reasonable. It's broken down into elements here...."

Defense counsel reviewed the elements of perfect self-defense, and argued the evidence showed defendant acted "in complete self-defense" and there was "a complete self-defense in this case, and as such, [defendant] has committed no crime as the instructions says and must be found not guilty."

Defense counsel concluded:

"A killing is justified when done in lawful self-defense. That's what happened here. This was not murder, because [defendant] acted without malice. He acted in reasonable fear of the walking deadly threat that was Mr. Sorensen on that occasion, who intruded his home as he and Ms. Bruederle were getting ready for bed.

*"[Defendant] was not acting with malice aforethought because his act was not unlawful. It was the lawful use of self-defense. This is not that voluntary manslaughter because [defendant] was not acting in the heat of passion.* Mr. Sorensen burst in violently and unlawfully shoving Ms. Bruederle out of the way confronting [defendant], fists raised, aggressive, erratic out of control. All the while [defendant] knew Mr. Sorensen was likely to be armed, but [defendant] did not fire his weapon. He showed it to Mr. Sorensen, he warned Mr. Sorensen that he had a weapon, repeatedly told him to get out of the apartment. At gunpoint. But [defendant] didn't fire. He did not fire until Mr. Sorensen left or appeared to be leaving and then decided to up the stakes and come back in, and in doing so, raising the threat of imminent death or great bodily injury exponentially.

*"[Defendant] is not guilty. He acted in complete self-defense, and the People have not proved beyond a reasonable doubt that he did not act in self-defense."* (Italics added.)

Defense counsel thus expressly and correctly explained that if the jury found defendant acted in perfect self-defense and committed a justifiable homicide, he was not guilty of any criminal offense, including both murder and manslaughter. (See, e.g., *People v. Cady, supra*, 7 Cal.App.5th at p. 149.)

Finally, there is nothing in the record to indicate any confusion by the jury on the question of justifiable homicide and manslaughter. (See *Hayak, supra*, 58 Cal.4th at p. 1221.) During deliberations, the jury sent one note to the court that requested to hear the trial testimony of defendant, Meade, and Wolfe. The jury did not send any other notes or ask any questions.

We conclude that the omissions were not prejudicial under any standard of review given the entirety of the instructions, which included the language omitted from CALCRIM Nos. 505 and 506, that these points were made in closing argument, and there is no evidence or indication the jury was confused by the instructions about perfect self-defense and justifiable homicide. For the same reason, we find any failure by counsel to make additional objections or request another admonition is not prejudicial.

## IV. Cumulative Error

Defendant asserts the cumulative errors resulting from the introduction of Sorensen's photograph, the prosecutor's misconduct in closing argument, and the instructional omissions about justifiable homicide and manslaughter, require reversal of his conviction for voluntary manslaughter.

"We have rejected nearly all of [the] defendant's assignments of error, and when we have determined that the trial court erred, we have concluded that the error did not result in prejudice to defendant. Even considered collectively, the errors were not significant." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382.) To the extent we have concluded errors occurred, those errors, even when considered cumulatively, did not deprive [the] defendant of a fundamentally fair trial. (*People v. Fuiava* (2012) 53 Cal.4th 622, 716–717.)

54.

# THE SENTENCING HEARING

Defendant raises three separate issues about the court's orders at the sentencing hearing: the matter must be remanded for resentencing in light of the amendments to section 1170, subdivision (b) enacted by Senate Bill No. 567 (2021–2022 Reg. Sess.), because the court imposed the upper term for manslaughter based on aggravating factors not found true by the jury; the court failed to treat evidence of defendant's service-related posttraumatic stress disorder (PTSD) as a mandatory mitigating factor as required by section 1170.91; and the court improperly imposed the restitution fine of $6,000 and the other fees without finding he had the ability to pay these amounts.

Prior to addressing these contentions, we review the factual and procedural background for defendant's arguments and the court's findings at the sentencing hearing.

## A. *Aggravating Circumstances and Defendant's Prior Convictions*

Prior to trial, the People moved to introduce defendant's prior misdemeanor convictions for hit and run in 2017 in San Joaquin County and driving under the influence of alcohol in 2018 in Stanislaus County. The People did not submit any certified records about defendant's prior convictions. Defendant filed opposition and argued the misdemeanor convictions were not crimes of moral turpitude. The trial court excluded defendant's prior misdemeanor convictions but held that if he testified that he did not have any prior convictions, then he could be impeached with them. While defendant testified at trial, he did not open the door on this issue, and he was not impeached and did not admit any prior misdemeanor convictions.

Prior to the sentencing hearing, the People filed a sentencing statement and argued that while defendant only had two prior misdemeanor convictions, the court should consider the underlying facts of those convictions, offered a narrative summary of the offenses, and argued his prior criminal conduct was not insignificant. In support of this argument, the People submitted photocopies of the charging documents, minute orders,

and police reports. The instant record does not appear to contain any certified documents of his criminal record.

The probation report stated there were no mitigating circumstances and listed the following aggravating circumstances: the crime involved great violence, great bodily harm, and acts disclosing a high degree of cruelty, viciousness, and/or callousness; the victim was particularly vulnerable; defendant engaged in violent conduct that indicates a serious danger to society; and he was on probation when the crime was committed. While the probation report stated defendant was on probation at the time of the offense, it did not list any information about his prior convictions giving rise to that probationary status.

## B.     *Defendant's Diagnosis of PTSD and Section 1170.91*

Prior to trial, the People filed a motion to exclude any reference to defendant's status as a veteran, because any references to his discharge under "honorable conditions for 'misconduct, (serious offense)' " was irrelevant and prejudicial. The People also moved to exclude any evidence regarding defendant's "speculative claim" that he suffered from PTSD at the time of the charged offense, because defendant had not provided any discovery or admissible evidence establishing such a diagnosis had been made and was a factor in Sorensen's death. At a hearing on the motion, the trial court asked defense counsel if these issues were going to be raised, counsel said no, and the court granted the People's motion, so the issues were not presented to the jury.

After conviction, defendant filed a sentencing statement that summarized his military record, stated that he was diagnosed PTSD as a result of his military service, and that the court was required to consider his PTSD as a mandatory mitigating factor pursuant to section 1170.91.

In support of these arguments, defendant submitted copies of his military records; defendant's sworn declaration that he was treated for PTSD at a veteran's hospital after discharge, and that he was subsequently approved for veteran's benefits for being

diagnosed with PTSD; a 2018 "rating decision" from the California Department of Veterans Affairs, granting his claim for several service-related conditions, including PTSD "as directly related to military service," with an evaluation of 70 percent, and detailed records as to the department's findings.

The People filed a sentencing statement, acknowledged defendant's records about his military service and diagnosis of service-related PTSD, but argued there was no evidence when or where he sought treatment since he was discharged from the military in 2011 and filed the disability claim in 2018. The People argued the PTSD diagnosis did not constitute a mitigating factor and cited pretrial statements from Wolfe and defendant's former wife, that defendant was violent before he entered the military.[15]

The probation report stated defendant enlisted in the Army in 2009 and was discharged in 2012; that he reported he had PTSD but "only received limited counseling. He reported issues in obtaining any assistance from the Veterans Affairs," and was not taking any medication. It did not list the PTSD diagnosis as a mitigating factor.

### C.  *Sentencing Hearing*

On October 18, 2021, the court held the sentencing hearing, heard arguments from the parties, and denied probation:

> "This is not a case for which probation should be granted. The Court does understand the Court has authority to strike the gun use; this Court is not inclined to do [so]. I think that would be a travesty of justice if the Court did that here. There's … no reason to strike that gun use here, and … the

---

[15] As explained above, the court excluded evidence of defendant's prior violent acts from trial.

In support of the sentencing statement, the prosecution attached copies of Wolfe's pretrial interview, where she said defendant (her half brother) and others in their family were "diagnosed with PTSD from when we were younger from the way that we were treated," and he never sought out treatment. Wolfe also stated defendant's former wife said he was diagnosed with PTSD.

court is not going to. [¶] [The] Court understands its discretion, but [the] Court also heard the evidence here."[16]

The court then turned to the aggravating factors, and that "[m]ost particularly" those factors were that Sorensen was "particularly vulnerable; he had no option when that gun came out of [defendant's] hand and was pointed at him," and he had no way to defend himself. Sorensen "was somewhat intoxicated that night, still, from having been to the bars. [Defendant] knew also that Mr. Sorensen had been drinking and knew that he was intoxicated, knew of … his situation and his health and everything, and did occupy the friendship position of trust." Sorensen was unarmed and did not have anything in his hands, defendant was the only person who was armed, defendant was "a very good shot," and he shot him through the head. The court stated there were no mitigating circumstances.

The court also found as aggravating factors that defendant suffered two prior misdemeanors convictions that were one year apart from each other, for hit and run and driving under the influence, and he was on two grants of informal probation.

The court stated that it had reviewed defense counsel's motion and arguments to consider defendant's service-related PTSD as a mitigating factor. The motion was denied because there was no evidence his alleged PTSD contributed to his commission of the homicide, and such an argument was inconsistent with his trial defense that he reasonably believed Sorensen posed a threat to Bruederle and himself. The court stated:

> "[Defendant] never said, Because I have PTSD, I suddenly felt that people were coming at me and, and that's the basis for what happened here. [¶] So that's one of the reasons why the Court doesn't see … anything that's mitigating in this case, because that really wasn't part of the evidence here. No one heard that [defendant] suffered … from the PTSD and that's why

---

[16] Since the jury found true the section 12022.5, subdivision (a) enhancement, that defendant personally used a firearm in the commission of the offense, defendant was statutorily ineligible for probation except in unusual circumstances where the interests of justice would be served by the granting of probation. (§ 1203, subd. (e)(2).)

58.

he was making an error in his judgment or anything. I mean, there wasn't any basis for that mitigating evidence."

The court also agreed with the prosecutor's argument that defendant never sought out treatment for his alleged PTSD.

Defense counsel objected to the court's statements. The court replied that defendant's military service and PTSD diagnosis did not mitigate his conduct or outweigh the more serious aggravating factors, and again noted defendant never claimed he "overreacted" to the situation with Sorensen because of PTSD or previously sought treatment for his alleged diagnosis.

The court stated that defendant posed a great danger to the community based on the trial evidence, he was on informal probation, his crimes were of increasing seriousness, the victim was vulnerable, and defendant was in a position of trust with him; and his military service was not a mitigating factor under the circumstances of this case.

The court imposed an aggregate term of 21 years, based on the upper term of 11 years for voluntary manslaughter, plus a consecutive upper term of 10 years for the firearm enhancement.

## DEFENDANT'S SENTENCING ISSUES

### V. Imposition of the Upper Term

Defendant's first sentencing issue is that the matter must be remanded for resentencing in light of the amendments to section 1170, subdivision (b) because the court imposed the upper term by relying on aggravating factors that were not found true by the jury beyond a reasonable doubt, that is now prohibited after the amendments enacted by Senate Bill No. 567.

### A. *Senate Bill No. 567*

At the time of defendant's sentencing hearing, "the trial court had broad discretion to determine whether imposition of the lower, middle, or upper term … 'best serve[d] the interests of justice.' [Citation.] Consistent with the law at that time, the trial court

identified a number of factors in aggravation and no factors in mitigation, and it ultimately chose to impose an upper term sentence … based on these aggravating factors." (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464, fn. omitted (*Lopez*).)

"On October 8, 2021, Senate Bill 567 was signed into law. It amended the determinate sentencing law, section 1170, subdivision (b), which delineates the trial court's authority to impose one of three statutory terms of imprisonment, known as the lower, middle, or upper terms, by making the middle term the presumptive sentence for a term of imprisonment, unless certain circumstances exist." (*People v. Dunn* (2022) 81 Cal.App.5th 394, 402, review granted Oct. 12, 2022, S275655.)

The amended version of section 1170, subdivision (b) did not become effective until January 1, 2022, while the instant appeal was pending. (*People v. Dunn*, *supra*, 81 Cal.App.5th at p. 402.) "[U]nder the newly amended law, the trial court may impose an upper term sentence only where there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying all of the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or a trial court if the defendant has consented to a court trial. [Citation.] Also, under section 1170, subdivision (b)(3), the trial court, 'may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury.' [Citation.] Under amended section 1170, subdivision (b)(5), the trial court must 'set forth on the record the facts and reasons for choosing the sentence imposed. The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law.' " (*Ibid*.)

**B.** *Analysis*

The parties herein agree that "Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January

1, 2022." (*Lopez, supra*, 78 Cal.App.5th at p. 465; *People v. Dunn, supra*, 81 Cal.App.5th at p. 403.)

Defendant contends the matter must be remanded for resentencing because the court imposed the upper terms for both manslaughter and the firearm enhancement based on aggravating factors not found true by the jury beyond a reasonable doubt, in violation of the amended provisions of section 1170, subdivision (b).

The People agree remand is required for a resentencing hearing consistent with the amended version of section 1170, subdivision (b) "[b]ecause the trial court relied upon factors in aggravation that were neither admitted by [defendant] nor found to be true beyond a reasonable doubt."

We agree and vacate the sentence and remand the matter for a resentencing hearing. In doing so, we express no opinion as to what sentence should be imposed on remand.[17]

## VI. Section 1170.91 and Mitigating Circumstances

Defendant next argues that at the sentencing hearing, the court was statutorily required to treat his diagnosed PTSD as a mandatory mitigating circumstance under section 1170.91 when it was deciding whether to impose the lower, middle, or upper term, but refused to do so.

The People acknowledge the provisions of section 1170.91 but assert the court's findings show that it considered defendant's service-related PTSD and declined to give any weight to that factor. The People concede, however, that since the matter must be

---

[17] While there were some references in the record that defendant had two prior misdemeanor convictions and was on probation at the time of the homicide, these statements were made in various motions, the prosecution only submitted photocopies of some supporting records, defendant was not impeached with any prior convictions during his trial testimony, and the probation report was silent about any prior convictions.

On remand, the trial court "may consider the defendant's prior convictions in determining sentencing *based on a certified record of conviction without submitting the prior convictions to a jury*." (§1170, subd. (b)(3), italics added.)

61.

remanded for resentencing, defendant may again raise his PTSD as a mitigating factor under section 1170.91.

As explained in part V., above, we are required to vacate the entirety of defendant's sentence for a new sentencing hearing, and defendant may raise this issue on remand. We briefly address section 1170.91 for guidance on remand.

## A. *Section 1170.91*

Section 1170.91 became effective on January 1, 2015, and consisted of the language now stated in subdivision (a). (*People v. Estrada* (2020) 58 Cal.App.5th 839, 841; *People v. Bonilla-Bray* (2020) 49 Cal.App.5th 234, 238; *People v. King* (2020) 52 Cal.App.5th 783, 788; Stats. 2014, ch. 16, § 2.)

> "If the court concludes that a defendant convicted of a felony offense is, or was, a member of the United States military who may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of his or her military service, *the court shall consider the circumstance as a factor in mitigation* when imposing a term under subdivision (b) of Section 1170…." (§ 1170.92, subd. (a), italics added.)[18]

Section 1170.91, subdivision (a) "*obligate[s]* a court to consider a defendant's service-related mental health issues, including PTSD, as a mitigating factor … in selecting the appropriate determinate term." (*People v. Panozo* (2021) 59 Cal.App.5th 825, 828 (*Panozo*).) Subdivision (a) "speak[s] in terms that are mandatory rather than permissive." (*Id.* at p. 836.)

The provisions of section 1170.91 do not apply to persons convicted of certain enumerated felonies, an offensive requiring registration pursuant to section 290, subdivision (c), or sentenced to an indeterminate term. (§ 1170.91, subd. (c); *People v.*

---

[18] In 2018, the Legislature amended section 1170.91 to add subdivision (b), to allow defendants sentenced prior to January 1, 2015 (before the effective date of the initial version of the statute) to file a petition for recall and request resentencing for the court to take into account mitigating factors related to military service. (*People v. Estrada, supra,* 58 Cal.App.5th at p. 841.)

*Estrada, supra,* 58 Cal.App.5th at p. 843; *People v. King, supra,* 52 Cal.App.5th at p. 788.)

**B.**     *Analysis*

Defendant asserts the court violated section 1170.91, subdivision (a) by failing to consider his service-related PTSD as a mandatory mitigating circumstance when it imposed the upper term.[19]

As set forth above, the court stated at the sentencing hearing that it reviewed defendant's sentencing motion and acknowledged his military records and the documents regarding the PTSD diagnosis. While the court made "ample references" to defendant's military service and the PTSD diagnosis, "there is no indication the court understood its *obligation* to consider that fact as a circumstance in mitigation when making discretionary sentencing choices." (*Panozo, supra*, 59 Cal.App.5th at pp. 837, 831–832.)

In addition to the issue of the imposition of the upper term, we are thus required to remand the matter for resentencing on this point because "a court's compliance with the mandate[] of [section] … 1170.91 cannot be inferred from an ambiguous record." (*Panozo, supra*, 59 Cal.App.5th at pp. 836–837, fn. omitted.)

As a separate matter, defendant requests this court take judicial notice of certain legislative history materials regarding section 1170.91, subdivision (a). The People filed opposition and argued that it is appropriate to deny judicial notice of such items and

---

[19] Section 1170.9 separately requires the court to consider a defendant's service-related mental health issues, including PTSD, as a mitigating factor in evaluating whether to grant probation. (*Panozo*, *supra*, 59 Cal.App.5th at p. 828.) As explained above, defendant was statutorily ineligible for probation based on the jury's finding on the section 12022.5, subdivision (a) firearm enhancement, except in unusual circumstances where the interests of justice would be served by the granting of probation. (§ 1203, subd. (e)(2).) The court declined to find any unusual circumstances and declined to strike the firearm enhancement. Defendant has not challenged the court's decisions under section 1170.9. We therefore focus only on section 1170.91 and the selection of the determinate term.

instead " 'consider the request for judicial notice as a citation to those materials that are published.' " (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1129, fn. 4.)[20]

We agree and thus deny defendant's request for judicial notice but treat the motion as one stating additional authorities.

Defendant cites to the following language from the legislative history of Assembly Bill No. 865 (2017–2018 Reg. Sess.):

> "*Staff notes that this bill does not require the military service-related trauma to be a contributing factor of the offense.* Consequently, if an inmate-veteran suffered from one of the specified condition as a result of his or her military service, but that condition played no role in the commission of the offense, the court still would be required to consider the condition as a mitigating factor of the crime. This could result in a greater number of inmate-veterans petitioning the court for resentencing." (Sen. Com. on Appropriations, analysis of Assem. Bill No. 865 (2017–2018 Reg. Sess.) Apr. 30, 2018], p. 3, italics added.)

Defendant relies on the italicized statements above to argue that when the court addressed his military record at the sentencing hearing, it improperly stated that it would not consider his service-related PTSD as a mitigating factor because it was not connected to his commission of the offense.

We decline to reach this issue since the matter is being remanded. We note, however, that the legislative documents relied upon by defendant are not related to the language of section 1170.91, subdivision (a), that was originally enacted by Assembly Bill No. 2098 (2014 Reg. Sess.) and effective in 2015, but instead to the statutory amendments enacted by Assembly Bill No. 865 (2017–2018 Reg. Sess.) in 2018 that added subdivision (b)'s provisions for recall and resentencing.

---

[20] On March 3, 2022, defendant requested this court take judicial notice of legislative analysis of Assembly Bill No. 865 (2017–2018 Reg. Sess.), dated April 30, 2018, from the Senate Committee on Appropriations. On March 24, 2022, the People filed opposition. This court deferred ruling on the motion pending consideration of the appeal on the merits.

Assembly Bill No. 2098 originally enacted the language now contained in section 1170.91, subdivision (a). The legislative history stated the bill did not require the court "to impose the lower prison term [but] simply directs the judge to consider such circumstances in determining … whether to impose the lower prison term for convictions and enhancements punished under the determinate sentencing law." (Sen. Com. on Public Safety, analysis of Assem. Bill No. 2098 (2013-2014 Reg. Sess.) June 9, 2014, p. 6.) The legislative history of Assembly Bill No. 2098 additionally addressed "Military Related Trauma as a Consideration in Sentencing" and stated: "This bill would require the court to consider a defendant's status as a veteran suffering from sexual trauma, traumatic brain injury, PTSD, substance abuse, or other mental health problems as result of his or her military service as a factor in mitigation when determining the appropriate sentence." (*Id.* at p. 7.)

On remand, the court must satisfy its statutory obligation under section 1170.91, subdivision (a). As with our previous order for remand, we express no opinion on how the court should impose sentence.

## VII.    The Restitution Fine and Fees

Defendant's final issue is that the court improperly imposed the restitution fine of $6,000 (§ 1202.4, subd. (b)), along with a criminal conviction assessment of $30 (Gov. Code, § 70373), and a court operations assessment of $40 (§ 1465.8) because he did not have the ability to pay such amounts in violation of *People v. Dueñas* (2019) 30 Cal.App.5th 1157.[21]

Since the matter must remanded for resentencing, it is not necessary for this court to address the merits of defendant's contentions about the amount of the restitution fine

---

[21] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

and fees at this time. (See, e.g., *People v. Rosas* (2010) 191 Cal.App.4th 107, 117–121 [restitution and parole revocation fines are not a severable part of a judgment and are within scope of a remand for resentencing]); *People v. Buycks* (2018) 5 Cal.5th 857, 893 [explaining the " 'full resentencing' " rule]; *People v. Acosta* (2018) 29 Cal.App.5th 19, 26; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1257–1259.) At the hearing on remand, defendant may make any appropriate motions.[22]

## DISPOSITION

Defendant's request for judicial notice is denied and treated as a letter stating supplemental authorities.

Defendant's conviction for voluntary manslaughter and the jury's true finding on the section 12022.5, subdivision (a) enhancement are affirmed.

---

[22] At the October 2019 sentencing hearing, defense counsel did not object when the court imposed the restitution fine and fees, even though the court imposed a restitution fine greater than the statutory minimum of $300. When the court imposes a restitution fine greater than the $300 statutory minimum amount, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay," and defendant's failure to object results in forfeiture of the issue. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153.) As for the two fee assessments, "nothing in the record of the sentencing hearing indicates that [the defendant] was foreclosed from making the same request that the defendant in *Dueñas* made in the face of those same mandatory assessments. [The defendant] plainly could have made a record had his ability to pay actually been an issue. Indeed, [he] was obligated to create a record showing his inability to pay the … restitution fine, which would have served to also address his ability to pay the assessments." (*Id.* at p. 1154.)

We further note defendant's sentencing hearing occurred three years after *Dueñas* was decided. Despite the absence of an objection, the court made an ability-to-pay finding: "Given the great loss to society here and your young age, I think you can still have the ability to pay back society. So normally the Court would use the $300 minimum amount times the number of years here, so I'm going to select a $6,000 Restitution Fund fine, given that I think you're able to pay that." (See, e.g., *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069–1079.)

Since the matter is being remanded, we need not address defendant's ineffective assistance argument based on counsel's failure to object to the fine and fees.

Defendant's aggregate determinate sentence of 21 years is vacated, and the matter remanded for further appropriate proceedings consistent with this opinion.


POOCHIGIAN, Acting P. J.

WE CONCUR:


DETJEN, J.


SNAUFFER, J.